GEORGE J. MAAS *v.* DIANE MAAS LUCAS ET AL.

[No. 307, September Term, 1975.]

*Decided December 31, 1975.*

522

The cause was argued before ORTH, C. J., and DAVIDSON and LOWE, JJ.

*Nelson R. Kerr, Jr.,* with whom were *Kerr, Kerr & Howe* on the brief, for appellant — cross-appellee.

*Richard C. Murray* for appellees — cross-appellants.

LOWE, J., delivered the opinion of the Court.

A proverb, much used in a part of England where estates do not long stay in one family, declares:

> "The father buys, the son builds, the grandchild sells and his son begs."

When the father buys, the father builds, the father sells and the children benefit well beyond that which the father intended, a continued pressing of legal advantage must indeed sharpen the "serpent's tooth" alluded to by King Lear.[1] The father, appellant here, bought and also built upon property, one-half interest in which he [and his former wife] had conveyed to his two children as tenants in common pursuant to a marriage dissolution in 1943. Sometime after that conveyance he improved a garage on the back lot of the property by building two apartments over it.

---

1. William Shakespeare's, *The Tragedy of King Lear,* Act I, Scene IV, 1. 295.

The father instituted a suit in the Circuit Court for Baltimore County for sale in lieu of partition. In addition to the value of his one-half interest he sought reimbursement for the improvements and contribution from the children for the mortgage he had paid off after they had become half owners.

All issues on appeal relate to the distribution of the funds received from a sale of the property. When the sale was first held under court order, the children's bid of $80,000 was accepted as the highest. However, even though time extensions were obtained to permit compliance with the contract of sale, they were forced to default. The trustees again offered the parcels for sale at public auction under order of the court ". . . to resell the property described in this proceeding at the risk and expense of the Defendants [the children]." The resale brought a purchase price of $95,500, which was $15,500 higher than the original purchase price bid at the first sale by the children.

The questions having to do with the distribution of proceeds from that sale, here raised by appeal and cross-appeal, are:

1. Should the father be compensated for the improvements he had constructed (two apartments)?

2. Should the children be awarded one-half of the apartment rentals during their co-tenancy (and between the first and second sale)?

3. Who is entitled to the $15,500 increase in the purchase price after the children defaulted?

4. Is the father entitled to contribution for discharging the prior mortgage?

The chancellor did not compensate the father for the value of the apartments, finding that the father had not met his burden of proof. However, he sought to balance the equities somewhat by denying the children an allowance for rentals therefrom during the co-tenancy. The children were

awarded the amount of money by which the final purchase price exceeded the price at the initial sale upon which they had defaulted, and were also allowed the rental payments for the apartments between the dates of the two sales. The chancellor also compelled contribution from the children for one-half of the cost of discharging a mortgage which was paid off by the father soon after the creation of the co-tenancy.

### The Law

"A circuit court may decree a partition of any property . . . on the . . . petition of any . . . tenant in common . . . . If it appears that the property cannot be divided without loss or injury to the parties interested, the court may decree its sale and divide the money resulting from the sale among the parties according to their respective rights . . . ." Real Property Art., § 14-107.[2]

Such an action is equitable in nature so that the chancellor is accorded broad discretionary authority. In *Dugan and Lyman, Trustees v. Mayor, &c of Baltimore*, 70 Md. 1, 8, the Court of Appeals quoted Justice Story:

" 'In matters of partition' says Judge STORY, 'a Court founds itself upon its general jurisdiction as a Court of equity, and administers its relief, *ex oequo* [sic] *et bono* according to its own notions of general justice and equity between the parties.' 1 *Story's Equity Juris., sec.* 656 b."

Recently, the Court of Appeals has again described the latitude allowed an equity court in distributing the proceeds of a partition sale. Judge Horney wrote for the Court in *Bowers v. Balto. G. & E. Co.*, 228 Md. 624, 629:

"With respect to a sale [in lieu of partition] . . . , we repeat what was probably first said in *Story v.*

---

2. Md. Code, Art. 21, § 14-107 contains the precise section under which the partition took place. The new language used above was simplified for purposes of clarity and style but remained substantially the same.

*Johnson,* 1 Y. & C. Ex. 538 (1835), 2 Y. & C. Ex. 586 (1837), that the 'Court, in decreeing a partition, does not act ministerially and in obedience to the call of those parties who have right to partition, but founds itself upon its general equitable jurisdiction,' and will 'adjust the equitable rights of all the parties interested in the estate.' . . . And see *Meyers v. East End Loan & Sav. Ass'n,* 139 Md. 607, 613 . . . , holding that courts of equity do not hesitate to adapt their methods to the exigencies of justice or to protect the equitable rights of those concerned . . . ."

Notwithstanding the broad discretion allowed the chancellor, there are certain general principles and guidelines to which he must adhere.

## 1. Improvements

One such principle relates to the compensation to which a co-owner may be entitled for the value of any improvement he has put upon the property. The chancellor below observed that:

"Although there is no Maryland case directly in point the general rule of law seems to be that a co-tenant who makes a substantial improvement to the property, such as the apartments constructed by George Maas, is entitled to be compensated, but only to the extent to which the improvements are shown to have enhanced the value of the property at the time of sale . . . . the burden is on the tenant who makes the improvements to show that they enhanced the value of the property, and it is in this respect that the plaintiff has failed to support his claim . . . . The plaintiff here relies on the testimony of Mr. Harry Riepe, an experienced and well known appraiser, but this court has read his testimony carefully and at no time did the witness ever state that at the time of sale the property was more valuable because of the construction of the

apartments over the garage on the rear portion of the tract . . . ."

Appellant agrees in his brief that:

"If this assertion by the Trial Court is factually correct, Appellant may not prevail on this point of his appeal."

We find the court's assertion to be correct both legally and factually. While it may be true that there is "no Maryland case directly in point . . ." there is certainly Maryland authority espousing the principle as being the law of Maryland. In *Williams v. Harlan*, 88 Md. 1, 5 the Court said:

"There can be no question that as between Wm. H. Greenway, and his co-tenants he would be entitled to a lien for the amount expended by him on improvements and repairs made upon the joint property with their knowledge or at their request or in good faith for the benefit of all. This doctrine is fully settled by all the authorities. Mr. Pomeroy in his *Equity Jurisprudence*, section 1239 says: 'When two or more persons are joint-owners of real or other property, and one of them in good faith for the joint benefit, makes repairs and improvements upon the property which are permanent, and add a permanent value to the entire estate, equity may not only give him a claim for contribution against the other joint-owners with respect to their proportional shares of the amount thus expended, but may also *create a lien* as security for such demand upon the undivided shares of the other proprietors.' To the same effect 13 Am. and Eng. Encyl. of Law, p. 602; *Green v. Putman*, 1 Barbour 500; *Hall v. Piddock*, 21 N.J. Eq. 311; *Gavin v. Carling*, 55 Md. 530." [3]

In an annotation entitled "Adjustment on partition of

**3.** Although the phrase "joint tenants" was used in Williams v. Harlan, the case involved a tenancy in common.

improvements made by tenant in common," 1 A.L.R. 1189, the rule for "Compensation out of proceeds of sale" concludes:

" . . . if the improvements made by one co-tenant add to the amount which the property will bring on the partition sale ordered, the amount so added is to be paid to him out of the proceeds of the sale, in addition to his pro rata share of the proceeds. . . ."

The author of the annotation lists Maryland as being in accord with this proposition, citing *Hogan v. McMahon*, 115 Md. 195, 202-3, and invites comparison with *Gittings v. Worthington*, 67 Md. 139.

However, as Judge Raine pointed out, the extent of a co-tenant's right to compensation for improvements is the extent to which his improvements enhance the value of the property at the time of sale. 59 Am.Jur.2d, § 53. Thus, compensation based upon the original cost of the improvement or even the replacement cost is not allowed "because it might result in the other owners being improved out of their property by an extravagent or unbusinesslike co-tenant, and the improvement may have depreciated at the time of the sale." Anno. 1 A.L.R. 1189, 1210.

A review of the testimony of appellant's expert witness affirms Judge Raine's observation. The testimony elicited was based upon replacement cost rather than on the amount by which the property was enhanced by virtue of the improvements at the time of sale. We certainly find no abuse of discretion in rejecting the testimony as failing to establish a foundation for compensation. *Cf. Trainer v. Lipchin*, 269 Md. 667; *Stratakis v. Beauchamp*, 268 Md. 643. Nor do we find the chancellor's conclusion that the tenant's improvements had not been shown to have enhanced the value of the property to be "clearly erroneous."

## 2. Rent

Although a co-tenant is normally entitled to an accounting for rent for three years prior to suit, *Colburn v. Colburn*, 265 Md. 468, 474, the chancellor refused to award to the children

any rent which accrued prior to the first sale. In doing so, he expressly exercised his broad equity discretion in distributing the proceeds of a partition sale, as heretofore noted. The chancellor's opinion said:

> "Ordinarily, one co-tenant must account to the other for rents received from third parties. On the other hand the court has the power to adjust the equities between the parties. Even though the facts in *McLaughlin v. Barnum*, 31 Md. 425, are different this court reaches the same result, for to do otherwise would be inequitable. Where the costs of the improvements were borne by George Maas and contribution to him has been denied herein, it would be a gross inequity to deprive him of the net rental income. As pointed out by the defendants it would be inequitable, if not outrageous, to deny the children an off-set for the rents against an allowance to the father of the credit for improvements. It would be equally inequitable to deny the father's claim for improvements, but to allow the children to share in the rental income that flowed solely from the improvements."

We find no error. In *Gittings v. Worthington*, 67 Md. 139, 149, the Court said:

> "It is undoubtedly within the power of a court of equity to adapt its methods to the exigencies of justice, . . . for the purpose of relieving the hardship of a particular case." (recited with approval in *Godwin v. Banks*, 89 Md. 679, 688 relating again to partition).

The chancellor was clearly within his authority. We note, however, that he did not attempt to apply that discretion to the rents that accrued between the first and second sale of the property, and for good reasons hereafter stated.

### 3. Overage

Upon default following their successful bid at the first

sale, the children, by decree, bore the risk that the resale might bring less than the bid they had defaulted upon. *Mealey v. Page*, 41 Md. 172, 183. Fortune smiled on them, however, and the resale brought more, not less, than their original bid. The chancellor awarded the children the $15,500 excess, and we think properly so.

Miller, *Equity Procedure*, § 526 explains the resale procedure under Chapter XXVI entitled "SALES UNDER DECREES," citing *Mealey, supra*, as authority:

"§ 526. Disposition of proceeds of sale. — When a re-sale is made the proceeds are to be disposed of as follows: the costs, fees and expenses of the re-sale, including the proper commissions, are to be deducted; and also the amount of the original purchase money due, with interest from the date of the first sale to the date of the receipt of the purchase money of the second sale. The proceedings for a re-sale, after final ratification, treat the first contract as binding on the original purchaser. The property is re-sold as the property of the defaulting purchaser, and at his risk. He is therefore entitled to any excess in the proceeds of sale at the re-sale, just as he would be responsible for any deficiency. The purchaser is to be charged with the whole purchase money and costs of the re-sale, and credited with the payments he has made, and with the proceeds of the second sale. If the latter amounts are not sufficient to pay the sum for which the property was first sold, the purchaser is to be charged with the deficiency. The application of the cash paid as a credit on his purchase is in no sense a forfeiture inasmuch as he is entitled to any surplus which may remain." [footnotes omitted].

The chancellor followed this directive to the letter. As our case law indicates, so have numerous other chancellors in Maryland. The theory was explained in *State v. Hoboken Bank*, 84 Md. 325, 330 that:

" . . . under a judicial resale the property is in fact

again put under the hammer, it is put there not as a new, distinct independent procedure, but as a means and solely as a means to realize the money which the original but defaulting purchaser failed to pay. The resale takes place under the original decree, supplemented by an order. It is made by the same trustees, in the same proceedings and with a view to pay off the same indebtedness for the payment of which the property was sold in the first instance, and the money realized by it is always applied precisely as would have been applied the money bid at the original sale had that money been paid by the first purchaser. The resale is simply an execution of the decree for a sale. Its very name imports that it is not such a new sale as to be a distinct proceeding."

The rationale is stated with simplicity in *Cont. Tr. Co. v. Balt. Refrig. Co.*, 120 Md. 450, 456 which explains that where the trustee at a sale has accepted a purchaser, and the sale has been approved and ratified, such purchaser becomes the equitable owner of the property. The first contract of sale was not set aside, but the re-sale "was a summary proceeding for the enforcement of that contract, and the property was resold as the property of the purchaser and at its cost and risk."

The same *ratio decidendi* was applied by the chancellor to the rents for the period between the two sales. That ruling is supported by rulings of the Court of Appeals from at least as early as 1868, until at least as late as 1968. In *Farmers' Bank of Md. v. Clarke*, 28 Md. 145, 156 it was stated:

"As the purchaser is made to bear all loss by depreciation subsequent to the time of sale, he should be entitled to all profit that he may be able to make of the property after that time."

In *Merryman v. Bremmer*, 250 Md. 1, 8, Judge Barnes wrote for the Court that:

"The purchaser is entitled to the rents and profits of the land sold as he has become the substantial

owner of the property. He is not only entitled to possession of the property, but it remains at his risk, even though legal title may not be conveyed. *Farmers' Bank v. Clark,* 28 Md. 145 (1868). Miller, *Equity Procedure,* § 512, page 604 (1897). If the land appreciates in value that benefit accrues to the purchaser; if it depreciates in value that is the purchaser's loss."

None of these cases involved the precise factual posture before us. Here the defaulting purchasers were also beneficiaries of the sale. Because of their purchase at the original sale and subsequent default, they have realized a greater amount of money as their share of the distribution than did the father. This resulted from the chancellor's division of the original purchase price between the co-tenants and his subsequent award of the entire excess of the second purchase price over the first to the defaulting purchasers. While this division is founded upon sound judicial precedent, in this particular case such a distribution allows one tenant to deprive his co-tenant of the true value of the property. It might have been avoided had Judge Raine been asked to order some procedure upon default other than sale at the original purchaser's risk which he was empowered to do under Md. Rule BR6, § c which provides:

"In case of default by the purchaser in a sale reported to the court, the court, on application, . . . may order a resale at the risk and expense of such purchaser, or *may take such other action as justice may require."* (Emphasis added).

### 4. The Mortgage Pay Off

At the time of the dissolution of the marriage in 1943, appellant and his wife conveyed the property by straw deeds to a straw party who reconveyed it to appellant and his children as tenants in common. Both straw conveyances

warranted the property specially and contained covenants that the grantors (parents) had done:

> "no act, matter or thing whatsoever to encumber the property hereby conveyed."

There was in existence at that time, however, a mortgage on the property executed by the real grantors, appellant and his wife, (as opposed to the straw party to whom they had represented that warranty). Less than one year later,[4] appellant discharged the mortgage by full payment of the $4,770 balance due. The children did not assume any obligation under the mortgage, nor was the mortgage assigned to appellant upon discharge for subrogation or otherwise. The payment was made and full release recorded.

Citing *Hogan v. McMahon*, 115 Md. 195, 203, appellees, as cross-appellants, recognize that:

> "'Where a tenant in common discharges a mortgage upon the joint property, equity treats him as an assignee of the mortgage as against his co-tenants interest in the property, and this though no actual assignment is made.' "

They further concede (this time, citing *Aiello v. Aiello,* 268 Md. 513) that the right of contribution can be enforced by obtaining an assignment, or by asserting a right of subrogation as a surety, or by enforcing an equitable lien against the co-tenant's interest. See also annotation, 48 A.L.R.2d 1305.

However, they contend that the father no longer has such relief available because of the lapse of over 25 years after he had a right to seek such relief. They base this conclusion on one or all of three equitable and legal reasons: laches, limitations and/or estoppel.

We find that the court below erred in awarding the father

---

4. The stipulation is that the mortgage was discharged November 18, 1943. The release thereon shows a date of March 3, 1944.

contribution for the discharge of the mortgage, although the chancellor's motivations were unquestionably equitable:

> "it would be inequitable, even outrageous, to allow the children to force their father to assume the whole burden of the mortgage when they received the benefit of his payment discharging the mortgage."

Notwithstanding that "courts of equity do not hesitate to adapt their methods to the exigencies of justice or to protect the equitable rights of those concerned . . .", *Myers, supra,* 139 Md. at 613, there is a barrier which even the "exigencies of justice" may not penetrate.

Here a presumption of a gift to appellant's infant children, *Brandenburg v. Harshman,* 193 Md. 104, 110; *Quillen v. Bell,* 158 Md. 677, 683; *Fister v. Fister,* 222 P. 2d 620 (Colo.), by his having paid off the mortgage, is bolstered by deeds declaring the property was conveyed unencumbered. The children were the objects of the father's natural bounty which "is of itself a circumstance sufficient to raise an inference that a gift was intended. . . ." *Cf.* Restatement (Second), *Trusts,* § 442 b; *Lacey v. Van Royen,* 259 Md. 80, 88-89. In light of the total absence of evidence to overcome the inference of a gift, the express conveyance "without encumbrances" from the parents through 'a straw party, and the release of the mortgage by the father with no attempt to secure a right to contribution by subrogation, assignment or lien (see *Aiello v. Aiello,* 268 Md. 513, 519); no equitable right in the father has been shown entitling the chancellor to balance the equities by forcing the children to contribute to the pay off of a mortgage which occurred more than 20 years prior to the distribution.

The authority upon which a co-tenant is ordinarily entitled to contribution for discharging a mortgage traces to *Hogan v. McMahon, supra,* relied upon by both parties. Further scrutiny of that authority revealingly distinguishes it from the facts of this case. *Hogan* relies primarily upon two cases, one from Maine and one from Maryland preceding *Hogan.*

The Maine case, *Look v. Horn,* 97 Me. 283, is quoted as saying:

> " 'Where a mortgage is discharged *on payment made by one of the joint mortgagors,* or his successors in interest, it may be treated in equity as still subsisting for the protection of the party making payment, or the delinquent's share in the mortgaged premises may be regarded as subject to a lien for the amount paid on the mortgage for his benefit.' " (Emphasis added). *Hogan v. McMahon,* 115 Md. at 203.

Here the children were not "one of the joint mortgagors," they were not indebted at all. The joint mortgagors were the father and his former wife. If not indebted, they were not delinquent and, consequently, there is no "delinquent's share in the mortgaged premises" to which a lien could attach.

The Maryland authority is more direct, if less explicit. *Parsons v. Urie,* 104 Md. 238 holds that when one or more of several tenants in common pays the joint mortgage debt on their land, he is entitled to have the mortgage *kept alive* so as to secure reimbursement of the amount paid from his co-tenants. That case reasons first from the more basic premise that:

> "It must be conceded that the general principle is that the payment of an incumbrance by one whose duty is to pay extinguishes it, although there are exceptions to the general rule which are as well settled as the rule itself." *Id.* at 248.

One of these well settled exceptions was expressed and applied as controlling.

> "It is well settled that if one tenant in common pay a mortgage debt, he can 'keep the mortgage on foot until reimbursed the moiety paid for the other tenant in common.' *Stebbens v. Willard,* 53 Vt. 665; *Look v. Horn,* 97 Me. 283." *Id.* at 251.

Although the exception noted in the Maine case that the

co-tenant was also a co-mortgagor was not expressed as a qualification to the rule laid down in *Parsons,* we note that the Court in *Parsons* looks to the Maine case for its authority. We also note that *Parsons'* facts indicate that the co-tenants were also mortgagors.[5] The father provided us no reply brief as cross-appellee, and we know of no authority that would permit the chancellor to impose a personal debt upon the children where none ever existed. Upon remand the children should be relieved of the obligation to contribute to their father's mortgage which he discharged over a quarter of a century ago.

> *Judgment affirmed in part and reversed in part.*
> *Case remanded for amendment of the decree in conformity with this opinion.*
> *Costs to be divided equally.*

---

**5.** Even the infants through a trustee.